SELLERS, Justice.
*1156 Mitchell's Contracting Service, LLC ("Mitchell"), appeals from the Wilcox Circuit Court's denial of Mitchell's renewed motion for a judgment as a matter of law or for a new trial in a wrongful-death action brought by Robert Guy Gleason, Sr., as the administrator of the estate of Lorena Gleason, deceased. We reverse the trial court's judgment and remand the cause for a new trial.
Introduction
According to Gleason's complaint as amended, James Pettway and Derrick Turner were both driving dump trucks in their capacities as employees of Mitchell when one of the trucks caused Lorena's vehicle to leave the road, where it collided with a tree, resulting in her death. Gleason asserted claims against Mitchell based on vicarious liability for Pettway's or Turner's negligent and wanton acts and omissions. A jury returned a verdict in favor of Gleason for $2.5 million. The trial court entered a judgment on that verdict and denied Mitchell's postjudgment motion. This appeal followed.
Timeliness of Appeal
As an initial matter, we must consider Gleason's argument that Mitchell's appeal was not timely filed. After the trial court entered a judgment on the jury's verdict, Mitchell, on October 19, 2016, filed a renewed "Motion for Judgment as a Matter of Law, and Motion to Alter, Amend or Vacate the Judgment, or in the Alternative, Motion for New Trial." In its motion, Mitchell argued that it was entitled to a judgment as a matter of law because, Mitchell asserted, Gleason had not presented sufficient evidence in support of his claim. Alternatively, Mitchell argued that it was entitled to a new trial based on the trial court's allegedly improper evidentiary rulings and other alleged errors.
On October 24, 2016, the trial court entered an order stating:
"MOTION FOR JUDGMENT AS A MATTER OF LAW, AND MOTION TO ALTER, AMEND OR VACATE THE JUDGMENT, OR IN THE [sic] filed by MITCHELL'S CONTRACTING SERVICE, LLC is hereby DENIED."
(Capitalization in original.) Approximately one week later, the trial court entered a second order, stating: "The Court's 10-24-16 order denying defendant's motion to alter or amend is hereby vacated and set aside as it was done in error." The second order also set a hearing date, stating: "A Hearing on the Motion is set on 12-16-16." Thereafter, the parties stipulated that no hearing would be necessary. Accordingly, the trial court canceled the hearing. The trial court never entered another order ruling on Mitchell's postjudgment motion, and the parties considered it to have been denied by operation of law 90 days after it was filed, i.e., on January 17, 2017. See Rule 59.1, Ala. R. Civ. P.
In response to a show-cause order issued by this Court on the question of the timeliness of the appeal, filed on January 30, 2017, Gleason argues that the trial court's October 24, 2016, order constituted a final judgment adjudicating Mitchell's postjudgment motion in its entirety. In support of his contention, Gleason argues that the trial court did not have jurisdiction to set aside its order a week after it entered it; that Mitchell's deadline to appeal began to run on October 24, 2016; and, thus, that its appeal, filed on January 30, 2017, was untimely. See, e.g., Southeast Envtl. Infrastructure, LLC v. Rivers, 12 So.3d 32 (Ala. 2008) (indicating that a trial court does not have jurisdiction to "reconsider"
*1157 a postjudgment motion once the motion is denied); and Attalla Health Care, Inc. v. Kimble, 14 So.3d 883 (Ala. Civ. App. 2008) (indicating that a trial court does not have jurisdiction to, sua sponte, set aside an order denying a postjudgment motion). Mitchell, on the other hand, argues that the October 24, 2016, order did not completely resolve the postjudgment motion because, it says, the order did not rule on Mitchell's request for a new trial.
The legal effect of a judgment is to be declared in light of the literal meaning of the language of the judgment. Southeast Constr., LLC v. WAR Constr., Inc., 159 So.3d 1227, 1238 (Ala. 2014). By its literal language, the October 24, 2016, order does not rule on Mitchell's motion for a new trial. It simply includes the superfluous words "or in the" following the two types of motions specifically mentioned. See also Rule 58(b), Ala. R. Civ. P. ("A written order or a judgment will be sufficient if it is signed or initialed by the judge, ... and indicates an intention to adjudicate, considering the whole record, and if it indicates the substance of the adjudication." (emphasis added)); and Carroll v. Buttram, 758 So.2d 1097, 1102 (Ala. 1999) ("A judgment must be clear and unambiguous in order to stand."). The language "or in the" was not sufficient to indicate an intent to deny Mitchell's motion for a new trial. Accordingly, the trial court's order of October 24, 2016, did not deny Mitchell's postjudgment motion in its entirety and Mitchell's appeal was timely filed.[1]
Facts
On the day of the accident, Mitchell, pursuant to a contract with the owner of a paper mill in Wilcox County, was engaged in transporting wood ash from the paper mill to a dump site southeast of the paper mill. Wilmar Contracting Company ("Wilmar"), who Mitchell's corporate representative described as Mitchell's subcontractor, was also involved in transporting ash to the dump site. Some of the dump-truck drivers transporting ash were employed by Mitchell and some were employed by Wilmar.
After loading their dump trucks, the dump-truck drivers would leave the paper mill and travel south along a state highway. They would then turn onto Wilcox County Road 12 and travel west toward the dump site. The accident occurred on County Road 12, which was described during the trial as a narrow two-lane road.
Wilmar dump-truck drivers Raymond Lovelace and Steve Maness each testified that, after delivering loads of ash to the dump site on the morning of the accident, they were traveling east on County Road 12 toward the state highway, en route to the paper mill. Lovelace testified that a loaded white dump truck passed him traveling in the opposite direction on its way to the dump site; that the white dump truck was not entirely within its lane; and that Lovelace had to move his dump truck over to allow the white dump truck to pass safely. Maness testified that he too encountered a white dump truck traveling west along County Road 12 toward the dump site. Lovelace confirmed that the *1158 white dump truck was one of the trucks being operated by Mitchell. Mitchell's principal member, who testified as its representative, stated that Derrick Turner, who was an employee of Mitchell, was driving a white dump truck on the day of the accident.
Both Lovelace and Maness testified that there was not a car resting against the tree off County Road 12 where Lorena's car was found when they drove east along County Road 12. They did, however, testify that another driver, Daniel Hunter,[2] who was also traveling east along County Road 12 at a distance behind Lovelace and Maness, telephoned each of them and indicated that he had seen that a car appeared to have left the road and was resting against a tree.
Lovelace testified that the white dump truck he encountered was the only dump truck he met on County Road 12 before Hunter informed him that Hunter had seen what turned out to be Lorena's car resting against a tree. Maness testified that he encountered two dump trucks as he was traveling east on County Road 12-the white truck and a black truck, which was also a Mitchell truck. Mitchell's representative testified that Mitchell employee James Pettway was driving a black dump truck on the day of the accident.
Hunter testified that, after he had delivered a load of ash to the dump site, he was traveling east along County Road 12 when a white dump truck passed him traveling in the opposite direction. He stated that he had personal knowledge of the truck and that he had no doubt that it was a truck being operated by a driver employed by Mitchell. Hunter testified that the truck was traveling at an excessive rate of speed, that the truck was traveling in the middle of the two-lane road, and that Hunter had to move his truck off the road to allow the truck to pass. According to Hunter, after the white dump truck passed him, he discovered Lorena's car against a tree and telephoned 911 emergency service. He also testified that he believed the accident had occurred recently because "smoke" was still coming out from under the hood of Lorena's car and because Lovelace, who was traveling in front of Hunter, had not seen the car.
Andrew Webb, Gleason's accident reconstructionist, testified that Lorena was traveling east on County Road 12 when she left the roadway onto the south-side shoulder, that she attempted to maneuver her vehicle back onto the road, that she over-corrected to the north side, that she lost control of her vehicle, and that her vehicle crossed over the road onto the north-side shoulder and struck a tree. Webb opined that Lorena had engaged in an avoidance maneuver in driving off the road onto the south-side shoulder and that there was no evidence of distracted driving on Lorena's part. He also opined that Lorena's vehicle struck the tree while traveling approximately 18 miles per hour. Photographs admitted into evidence show that the tree is relatively close to the north-side shoulder of the road. Mitchell's accident reconstructionist agreed that Lorena had originally left the road onto the south-side shoulder and that she lost control of the vehicle when she over-corrected in an attempt to move the car back onto the road. He testified, however, that the evidence was consistent with distracted driving.
Agee Smith testified that he witnessed a white dump truck force Lorena's vehicle off County Road 12:
*1159 "Q [By Gleason's attorney]. Now, Mr. Smith, on [the day of the accident], you were in Coy[, Alabama,] on that date?
"A. Oh, yes, sir.
"Q. Are you-where were you in Coy?
"A. I was traveling on County Road 12, but it be coming from my farm. It would be kind of east like northeast.
"Q. And what happened when you-you said you made it to the stop sign?
"A. As I approached on towards the stop sign, which would be down below the fire department, traveling on County Road 12. And we went on-I was turning north a little bit and still traveling on County Road 12, and I was coming around this curve-coming around the curve. I saw the little car kind of flank a little bit. And I said, well, what's going on? And as I was going on up, I could see this body of this big truck coming. And the big truck on the little small vehicle, it had it going on the side of the highway, it was all the way over cross the line, it was across the dividing line in the highway. It was on-
"Q. Will you tell the jury what kind of big truck you saw?
"A. It was a big dump truck. It was a big dump truck. And, you know, it was hauling some kind of soil, I believe.
"Q. And will you tell the jury, you said it was straddling the road. You mean, it was not in its lane.
"A. It was not in its lane. As I go to say, there was a northbound lane, so the truck was all in the northbound lane when it should have been-you know, it was southbound, but it was in the northbound lane when it should have been in the southbound lane.[3]
"Q. And was there a vehicle in front of you? You was saying some little vehicle. Do you know what color it was? Can you describe it?
"A. It was a little red-little red vehicle, and I saw a struggle with the vehicle. I saw somebody-I felt that they was fighting, I guess, for their life or fighting to get the vehicle under control. But seconds after then, when I looked over, the vehicle jumped across the-after the big truck zoomed on, the vehicle across-I guess, it was trying to, you know, take control of the vehicle, whoever was driving the vehicle, but it didn't happen. It was a big oak tree when it went across the-it went across after the-after the big dump truck had passed by, that's where they-it went across. The big dump truck gone on. And, myself, I didn't go up to the vehicle. I was thinking things. I saw things coming from the vehicle, but it was the steam coming from the radiator.
"....
"Q. Now let's go back.
"A. Okay-
"Q. You say you saw the big truck on the wrong side of the road.
"A. Yes.
"Q. And you saw the red car leave the road.
"A. That's right.
"Q. And you saw it come back on the road and land[ ] on this big oak tree; is that right?
"A. Yes. Landed on the big oak tree which would be to my left.
"Q. But you saw this big dump truck on the wrong, side of the road.
"A. Yes.
"Q. Was it green, red, black, or-what color now?
"A. White.
*1160 "Q. White. So you saw a white dump trunk; is that right?
"A. Yeah."
Mitchell truck drivers Derrick Turner and James Pettway each testified that they were driving trucks on the route in question on the day of the accident and that, as they were traveling west on County Road 12 toward the dump site, they saw Lorena's car resting against a tree. They both denied that they had caused her car to leave the roadway.
Discussion
Judgment as a Matter of Law
Mitchell asserts that Gleason did not establish that Lorena's death was proximately caused by one of its drivers because, Mitchell argues, there is no evidence indicating that a truck driven by a Mitchell employee forced Lorena's vehicle off the road.
" 'The standard of review applicable to a ruling on a motion for [a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying [that motion]. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.
" '....
" '... In ruling on a motion for a [judgment as a matter of law], the trial court is called upon to determine whether the evidence was sufficient to submit a question of fact to the jury; for the court to determine that it was, there must have been "substantial evidence" before the jury to create a question of fact. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' "
" American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala. 1993). (Citations omitted.)."
Acceptance Ins. Co. v. Brown, 832 So.2d 1, 12 (Ala. 2001).
It is not our role to reweigh the evidence. General Motors Corp. v. Jernigan, 883 So.2d 646, 669 (Ala. 2003). Thus, the question for this Court to answer is not what conclusion its members would have reached had they been on the jury that heard the case. Rather, the issue is whether from the evidence presented " ' "fair-minded persons in the exercise of impartial judgment [could] reasonably infer the existence of the fact sought to be proved." ' " Acceptance Ins. Co., 832 So.2d at 12 (quoting American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1367 (Ala. 1993) ).
Mitchell asserts that Gleason's theory of the case was based entirely on speculation because no one, including Agee Smith, testified that he or she witnessed a Mitchell dump truck force Lorena's vehicle off the road. The testimony, however, was sufficient to allow a fair-minded person to conclude that Lorena was forced off the road by a white dump truck traveling in the opposite direction and that the only dump truck in the area during the relevant time frame fitting that description was one driven by a driver employed by Mitchell. Accordingly, we cannot conclude that the trial court erred in denying Mitchell's motion for a judgment as a matter of law based on lack of proof that a Mitchell-operated dump truck caused the accident.[4]
*1161 Mitchell also argues that a judgment as a matter of law was due to be entered based on Lorena's alleged contributory negligence in failing to maintain control of the vehicle she was driving.
"In order to prove contributory negligence, the defendant must show that the party charged 1) had knowledge of the condition; 2) had an appreciation of the danger under the surrounding circumstances; and 3) failed to exercise reasonable care, by placing himself in the way of danger. Hatton v. Chem-Haulers, Inc., 393 So.2d 950 (Ala. 1980) ; Wallace v. Doege, 484 So.2d 404 (Ala. 1986)."
Rowden v. Tomlinson, 538 So.2d 15, 18 (Ala. 1988).
" '[I]t must be demonstrated that the plaintiff's appreciation of the danger was a conscious appreciation at the moment the incident occurred. [Citations omitted.] Mere "heedlessness" is insufficient to warrant a finding of contributory negligence as a matter of law. [Citations omitted.]' Central Alabama Elec. Co-op. v. Tapley, 546 So.2d 371, 381 (Ala. 1989)."
John R. Cowley & Bros. v. Brown, 569 So.2d 375, 382 (Ala. 1990).
"Although ordinarily it is a question of fact for the jury, the question whether a plaintiff is guilty of contributory negligence becomes a matter of law, and therefore one for the court to decide, when the facts are such that all reasonable persons must draw the same conclusion therefrom. Gross v. Republic Steel Corp., 400 So.2d 383 (Ala. 1981)."
Rowden, 538 So.2d at 18. Based on the applicable standards and our review of the evidence, this Court cannot determine that all reasonable persons must conclude that Lorena was contributorily negligent in not maintaining control of her vehicle. The trial court did not err in denying Mitchell's motion for a judgment as a matter of law.
New Trial
Mitchell asserts that Gleason, in responding to Mitchell's interrogatories, failed to identify Agee Smith as an eyewitness to the accident and that, as a consequence, the trial court should have continued the trial to give Mitchell's counsel an opportunity to depose Smith and to otherwise prepare for Smith's testimony. Mitchell's interrogatories to Gleason asked him to identify "any witnesses to the accident known to [Gleason] or to [his] attorney." Mitchell also asked Gleason to identify each person with knowledge of the accident and to state the nature of that knowledge. Gleason did not identify Smith in his initial responses to Mitchell's interrogatories. One year later, in June 2015, Gleason supplemented his responses after the trial court entered an order compelling him to do so. In his supplemental responses, Gleason stated that he was unaware of any eyewitnesses to the accident and that he would further supplement his responses as more information was obtained. In August 2016, approximately six weeks before the trial began, Gleason submitted a list of witnesses who might testify at the trial. Gleason's witness list identified 21 specific individuals by name and address, including Smith. The witness list, however, did not indicate that Smith had actually witnessed the accident.
In support of Mitchell's postjudgment motion, Mitchell's lead counsel submitted an affidavit averring that, "[a]t the beginning of the trial, [he] did not know that [Smith] had any knowledge about the incident."
*1162 Counsel also averred that, when Smith entered the courtroom on the day of the trial, Mitchell's counsel "briefly questioned him about the purpose of his testimony and was informed that he sought to testify about his eyewitness accounts of the incident."
After Mitchell objected to Smith's testifying and requested a continuance, Gleason's counsel informed the trial court that he had learned of the substance of Smith's testimony approximately two months before the trial and had subsequently designated Smith on Gleason's witness list. Gleason's counsel also asserted that Mitchell's liability insurer had spoken with Smith in connection with its investigation of the claim, although there is no evidence indicating that Smith had informed Mitchell's insurer that he had witnessed the accident.
Mitchell points to Barganier v. Barganier, 669 So.2d 933 (Ala. Civ. App. 1995), for the following proposition:
" ' "Generally speaking, the purpose of modern discovery is to assist the administration of justice, to aid a party in preparing and presenting his case or his defense, to advance the function of a trial in ascertaining truth, and to accelerate the disposition of suits. Beyond this, the rules for discovery are designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases and not upon the skill and maneuvering of counsel." 23 Am. Jur. 2d, Depositions and Discovery, § 155 (1965). Stated otherwise, the rules seek to "make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." United States v. Procter and Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958) ; Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).' "
669 So.2d at 936 (quoting Ex parte Dorsey Trailers, Inc., 397 So.2d 98, 103 (Ala. 1981) ). The Court in Dorsey Trailers, which the Barganier court quoted, provided a comprehensive discussion of the Rules of Civil Procedure relating to discovery and indicated that those rules should be liberally applied so as to provide for "full disclosure of relevant information." 397 So.2d at 103. The Court stated that "a party has a duty to provide all information available to him." Id. at 104.
Rule 26(e), Ala. R. Civ. P., provides:
"(e) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:
"(1) A party is under a duty seasonably to supplement the response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert witness is expected to testify, and the substance of the witness's testimony.
"(2) A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which the party (A) knows that the response was incorrect when made, or (B) knows that the response, though correct when made, is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
"(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time *1163 prior to trial through new requests for supplementation of prior responses."
It is not seriously disputed that Gleason failed in his duty to supplement his responses to Mitchell's interrogatories to specifically disclose his knowledge that Smith, who would be testifying as a witness, was an eyewitness to the accident.
Although trial courts are afforded considerable discretion in determining the sanctions for a party's failure to provide complete and truthful discovery responses, that discretion is not unlimited. See Edwards v. Valentine, 926 So.2d 315, 330 (Ala. 2005) (holding that allowing testimony of a previously undisclosed witness is a matter of discretion, which, if palpably abused, will result in a reversal of the judgment on appeal); and Eady v. Friese Materials Corp., 567 So.2d 857, 858 (Ala. 1990) ("Sanctions for failure to comply with a pretrial discovery order are within the discretion of the trial judge and will not be disturbed unless there is an abuse of discretion.").
We can find no cases where this Court has considered the consequences of a party's failure, in response to interrogatories in a civil action, to disclose the existence and identity of an eyewitness to an accident that resulted in death or serious injury preventing the accident victim from testifying. In this case, Gleason was reminded, if not directed, by the trial court to supplement his interrogatories as appropriate. When Gleason discovered two months before trial that Smith was an eyewitness to the accident (in fact the only eyewitness), he had an immediate and affirmative duty to disclose to Mitchell that Smith had witnessed the accident. In Evtush v. Hudson Bus Transportation Co., 7 N.J. 167, 81 A.2d 6 (1951), the representatives of two decedents sued the corporate operator of two buses and the individual drivers of those buses after the decedents were killed when the motorcycle they were riding collided with one of the buses. A response to an interrogatory asking the defendants to provide the names and addresses of "witnesses to the accident" identified only the individual bus drivers. During the trial, however, the defendants called two additional eyewitnesses, whom the trial court allowed to testify over the plaintiffs' objections. The jury returned a verdict in favor of the defendants, and the plaintiffs appealed. Both the New Jersey intermediate appellate court and the New Jersey Supreme Court concluded that the trial court had erred in allowing the witnesses to testify. The New Jersey Supreme Court stated:
"The rules for discovery here involved were designed to eliminate, as far as possible, concealment and surprise in the trial of law suits to the end that judgments therein be rested upon the real merits of the causes and not upon the skill and maneuvering of counsel. It necessarily follows, if such rules are to be effective, that the courts impose appropriate sanctions for violations thereof. We therefore conclude that the [intermediate appellate court] was right in reversing the judgment of the trial court and ordering a new trial, thereby eliminating the element of surprise which must have accrued to the benefit of the defendants at the previous trial because of their infraction of such rules."
7 N.J. at 173, 81 A.2d at 9.[5] See also *1164 Outback Steakhouse of Florida, Inc. v. Markley, 856 N.E.2d 65 (Ind. 2006) (reversing trial court's refusal to grant defendant restaurant relief from judgment against restaurant in dram-shop action based in large part on plaintiff's failure to supplement interrogatory response so as to inform restaurant that key eyewitness would, in direct contrast to her deposition testimony, testify during the trial that she had served restaurant customer alcohol while he was visibly intoxicated).
In the present case, Smith's testimony obviously was crucial, because he was the only person who claimed to have witnessed the accident firsthand. Even though Gleason's counsel learned of Smith's status as the only eyewitness two months before the trial started, he failed to inform Mitchell. Gleason's witness list identified Smith only as a possible trial witness; it did not disclose the substance of Smith's proposed testimony. In addition, Gleason provided his witness list to Mitchell only after Gleason had previously indicated that he was unaware of the existence of any eyewitnesses to the accident. Gleason's lack of candor in failing to supplement his responses to Mitchell's interrogatories prevented Mitchell from fully preparing for trial. Thus, it is clear to this Court that Mitchell was prejudiced initially by Gleason's failure to disclose that Smith was an eyewitness to the accident and critically by the trial court's refusal to continue the trial to allow Mitchell the opportunity to depose Smith.
Based on all the circumstances, this Court must conclude that the trial court exceeded its discretion in refusing Mitchell's request for a continuance. Accordingly, the trial court's judgment is reversed and the cause is remanded for a new trial. Because of our holding on this issue, this Court pretermits discussion of Mitchell's other arguments in support of its request for a new trial.[6]
REVERSED AND REMANDED.
Stuart, C.J., and Wise, J., concur.
Sellers, J., concurs specially.
Murdock, J., concurs in part and concurs in the result.
Parker, J., concurs in the result.
Bolin, Shaw, Main, and Bryan, JJ., dissent.
SELLERS, Justice (concurring specially).
I concur in the main opinion, which I authored. I write specially to respectfully respond to Justice Shaw's dissenting opinion. The legal profession requires its members to act professionally. The hallmark of a professional is not necessarily remuneration or success; rather, it is the quality of the services provided. Part and parcel of that quality is professional courtesy to the court, to opposing counsel, and to the general public.
According to the Committee Comments on 1973 Adoption of Rule 26, Ala. R. Civ. P., "[t]he purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the presentation of his case." Notwithstanding the myriad studies on accuracy of eyewitness accounts, in the hierarchy *1165 of witnesses an eyewitness is at the top. The testimony of someone observing an accident or the commission of a crime is critical to the presentation of a case, especially one such as the present case. Paramount in preparing for trial is identifying eyewitnesses and the subject matter of their testimony.
In this case, defendant's counsel specifically asked the plaintiff to identify all eyewitnesses, and he was told the plaintiff knew of none. Asked to supplement his responses and compelled to do so by the trial court, the plaintiff again responded that he knew of no eyewitnesses. Two months before the trial, the plaintiff discovered that, in fact, there was an eyewitness to the accident. He did not, however, supplement his discovery responses. In keeping with the high standards of professional conduct, plaintiff's counsel had a duty to inform defense counsel that there was an eyewitness to the accident; it was not enough to include the witness's name and address on a general witness list.
Especially in the present case, testimony from an eyewitness is vastly different from that of an expert witness. An expert witness gives an opinion that may be refuted, but an eyewitness gives testimony of actual observation of the incident giving rise to the litigation. In this case, because there was only one eyewitness, defense counsel was not afforded a sufficient opportunity to question the witness's line of sight or otherwise to prepare to mitigate the impact of the eyewitness's critical testimony. The prejudice resulting from plaintiff's failure to disclose is obvious.
Inasmuch as plaintiff's counsel could have prevented that prejudice by identifying the witness as an eyewitness, the trial court, by simply allowing a short continuance to give defense counsel an opportunity to depose the witness, could have eliminated the prejudice. In my view, the failure to continue a trial and allow for the deposition of a known, but undisclosed, eyewitness borders on per se abuse of discretion. Rather than requiring defense counsel to further demonstrate prejudice, we should require plaintiff's counsel to explain why he failed to give notice of his discovery of an eyewitness.
MURDOCK, Justice (concurring in part and concurring in the result).
I fully agree with the analysis in the main opinion on the primary substantive issue presented. Specifically, I believe the failure of the plaintiff to disclose the nature of Agee Smith's testimony clearly violated discovery requirements and was prejudicial because Smith was the only eyewitness to testify at trial. Thus, I believe we are compelled under the particular facts of this case to conclude, as does the main opinion, that the trial judge exceeded his discretion in not granting a new trial.
I concur only in the result reached by the main opinion as to the procedural issue of the timeliness of this appeal. That is, I believe this appeal is timely, but not for the reason stated in the main opinion. In particular, I believe the main opinion places too much reliance on the apparent omission of certain words following the phrase "or in the" in the trial court's order and that it is plain that the trial court intended its October 24 order to dispose of Mitchell's postjudgment motion in its entirety.
That said, the appeal nonetheless was timely because what would otherwise have been the trial court's terminal order, i.e., its order denying Mitchell's postjudgment motion for relief, remained in the breast of the court for 30 days. Drennen Motor Co. v. Patrick, 225 Ala. 36, 38, 141 So. 681, 682 (Ala. 1932) ("Until thirty days have elapsed all judgments by default or nil dicit are *1166 within the control of the court, as often said, are within the breast of the court, and, over such judgment during such period, the court has a discretionary power, irrevisable by mandamus, or otherwise, except for abuse of its discretion."). See also, e.g., Loggins v. State, 910 So.2d 146, 148 (Ala. Crim. App. 2005) ("It is well settled that a circuit court generally retains jurisdiction to modify a judgment for ... 30 days after the judgment is entered.").[7] Accordingly, the trial court had jurisdiction to correct itself and, in this particular case, simply to vacate that order a mere week after it was entered. Accordingly, Mitchell's original postjudgment motion was reinstated and was not denied until it was denied by operation of law 90 days after it was filed. The appeal in this case was filed within 42 days of the expiration of that 90-day period. Thus, the appeal before us was timely filed.

Gleason provides this Court with a "screen shot" allegedly generated by Alabama's electronic-filing system that, Gleason asserts, demonstrates that the trial court denied Mitchell's postjudgment motion in its entirety. The screen shot submitted by Gleason references the postjudgment motion and identifies its "disposition" as "denied." The screen shot, however, does not appear in the appellate record. Moreover, the Court does not agree that the status of the motion identified by the electronic-filing system should control over the language of the order itself.

It is not clear which entity-Mitchell or Wilmar-Hunter was working for on the day of the accident.

It appears that the portion of County Road 12 the dump trucks were using travels primarily east and west, although parts of it travel north and south.

Mitchell contends that Agee Smith was not a credible witness. It is the jury's function, however, to judge the credibility of witnesses. Flint Constr. Co. v. Hall, 904 So.2d 236, 250 (Ala. 2004).

Although there was some indication in Evtush that the defendants' failure to disclose the existence of two additional eyewitnesses to the accident might have been excused had the defendants not known the witnesses' identities at the time the defendants answered the plaintiffs' interrogatories, we have already determined that Gleason had a duty to supplement his interrogatory responses once he learned of the substance of Smith's testimony.

The Court notes that Mitchell asserts in its initial brief on appeal that it was entitled to a judgment as a matter of law based on the trial court's error in allowing Smith to testify. Mitchell, however, does not develop that argument or point to any authority supporting it. Moreover, in its reply brief, Mitchell asserts that the admission of Smith's testimony necessitates reversal and a new trial, not a judgment as a matter of law.

This 30-days-in-the-breast-of-the-court rule would not apply where a statute or our written rules of court specifically override that rule, as arguably would be the case with respect to the 90-day limitation imposed by Rule 59.1, Ala. R. Civ. P.